Cadmus *v.* Vreeland.

MARGARET CADMUS and others

*v.*

EDO VREELAND and others.

1. Construction of devise as to location of premises.

2. Declarations of testator as to boundary lines, made after the will was executed, are inadmissible.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. Charles H. Voorhis,* for complainants.

*Mr. G. Ackerson, Jr.,* for defendants.

THE CHANCELLOR.

Edo Vreeland, late of the county of Bergen, died in July, 1854, leaving a will dated August 3d, 1852, with a codicil thereto, dated February 26th, 1853. The latter contains the following devise to his daughter, Cornelia Elizabeth:

" I do give unto my daughter, Cornelia Elizabeth, the house and lot purchased of my son Elias, and all the lands between said lot and my son George's land, and to run back as far as a cross-fence in front or east of the woods; bounded north by George's lands; east, by the public road from the Boiling Spring to Hackensack; south, by lands of Matilda and Ackerman; and west, by the fence east of the woods."

By the fourth section of his will he had directed that all that part of his farm lying west of the Pollifly road, and southerly of the land previously given by the will to George, and easterly of the land given to his wife and his son Edo, be sold by his executors and the proceeds divided into six shares, of which he gave one to his daughter Margaret, or her children; one to his daughter Jane, or her children; one to each of his daughters Catharine, Christiann, and

Cornelia Elizabeth, and one to the children of his deceased
son Enoch.   Of the land mentioned in that devise, the land
devised to Cornelia Elizabeth by the codicil was part, and
the question is as to the extent of the devise in the codicil.
The part of the testator's farm which lay on the west of the
Pollifly road comprised both arable and woodland.   The
latter lay in a body on the westerly end of the farm.   On
the easterly side the woodland jutted out in a strip of timber
land, extending easterly, and about 500 feet in width.   On
the north side of the strip was cleared land, and on the
south, pasture and brush land.   In the rear of this cleared
and pasture and brush land was a fence, which ran from one
side of the farm to the other, through the woodland.   In
front of the strip of woodland there was a fence, also run-
ning from one side of the farm to the other.   The strip was
of the depth of about eleven chains and a half.   The com-
plainants insist that by the expression "the cross-fence in
front or east of the woods," in the devise in the codicil, the
testator meant the fence along the front of the strip.   The
defendants, on the other hand, insist that he meant the
other fence, in the rear thereof.   It appears in evidence that
the testator habitually designated the strip as "woods."
George E. Vreeland, one of his sons, says that the only
woods of his father's which he knows to have been called
by that name, was the strip and the peach orchard lot, (which
latter was a lot on the west end of the farm given to the
widow and the testator's son, Edo, in the will,) part of which
was woodland.   He says he never knew the wooded land
between those two lots to be called the "woods;" that that
land was usually called "the maple swamp," or, when he
designated it in Dutch, "die lange vlei," or the long swamp,
and that the strip was usually called "the wood lot in front,"
or some such name.   Elias E. Vreeland, another son of the
testator, testifies that the strip was usually spoken of as "the
wood lot," and that his father used to designate it as "the
front woods."   The testator's widow, sworn for the defend-
ants, says that the testator used to call it "the young woods."

Edo Vreeland, another of the testator's sons, also sworn for the defendants, testifies that his father called the woods beyond the strip " die lange vlei," the long swamp. Edgar E. Vreeland, also one of the testator's sons, sworn for the complainants, says that his father called that woods " die lange vlei," and the strip " the front woods," or, in Dutch, " die eerste bosch," and that he designated the woods in the peach orchard lot as " die achter bosch," or the back woods.

There appears to be no room for reasonable doubt as to the fence to which the testator referred in the devise in the codicil. It is, by the terms of the devise " the cross-fence in front or east of the woods." The only fence answering this description, is the fence in front of the strip. The fence next west of it, which the defendants insist is the one referred to, is not a fence in front or east of the woods, but a fence running through the woods. And the language of the will in the devise of the peach orchard lot, which, as before stated, was a lot partly covered with woods, is some evidence of the testator's intention in the use of the language under consideration. He speaks of a fence there as running " through the woods." That was a fence which divided the strip of woodland in the peach orchard lot from the " lange vlei," and for part of its length, along the cleared land, was not in or along the woods. The fence in front of the strip of woods, on the east side of the " lange vlei," was maintained by the testator for its entire length. The cleared land on the north of the strip was tilled by him and was called his " meislandt," or corn land, and the boggy meadow, called by him " die vleitje," or little lowland, on the south side of the strip, was used for pasture and was sometimes mowed. The strip was in one part heavily wooded. George E. Vreeland says the woods on the lot were hickory, oak, chestnut, and some small wood. Henry Outwater says that the woods on the strip extended westward right up to and across the second or westerly cross-fence. Elias E. Vreeland says the strip had " quite large timber " on it, and that they cut timber out of it for a new house. William Williams testifies that

there was large timber standing on the upper or northern part of it. He surveyed the land in 1871. He says that then, speaking approximately, the woodland comprised very nearly half of the lot, and it was an old growth. John H. Goetschius says that there was not much difference between the condition, as to size and thickness, of the growth directly west of the second fence and that between the first and second fences. Martin Ganter, sworn for the defendants, says the strip was all woodland, but on part of it there was only brush and some dogwood and birch, and here and there a timber tree, but on another part of it there were " heavy trees." And the widow testifies to the same effect. Mr. McKeon says that in the southerly part of the " spur," as he terms it, there were large trees, and he adds that " the part of the spur which was timbered would be about two-thirds, hardly that." Edo Vreeland's testimony is to the same effect. He says that the strip was a young woods at the time of his father's death. Edgar E. Vreeland testifies that along the second cross-fence there was, on the east side, a strip of twenty-five feet in width, and on it were hickory, birch and chestnut trees, and on the strip there was heavy timber.

It is evident that the strip was part of the woods, and that it was so regarded by the testator. The cross-fence in front or east of the woods is the fence in front of the strip. It answers the description. The other fence does not. There is, then, no latent ambiguity in the statement as to what is to constitute the western boundary of the lot given by the codicil to Cornelia Elizabeth. The testimony of the testator's declarations after the will was made, as to where and what the line was, is not competent evidence. *Nevius* v. *Martin*, 1 *Vr.* 465; *Boylan* ads. *Meeker*, 4 *Dutch.* 274; *Hand* v. *Hoffman*, 3 *Hal.* 78.

It is evident, it may be remarked, from the testimony of Mr. McKeon, that before the codicil was drawn, the testator intended to make the fence in front of the strip the western boundary of the land devised to Cornelia Elizabeth. It

seems that Mr. McKeon, who was the testator's step-son, endeavored to induce him to make a liberal provision for her (she was his half-sister), and had conversation with the testator on the subject.  He says : " It was a question in discussion whether the line in the codicil should be the fence east of the 'slank' or the fence in front of the big woods. He (the testator) favored the fence in front of the slank, as the other line fence was taking too much off of the other girls." Again he says : " He (the testator) favored the fence in front of the slank ; I urged upon him in front of the big woods ; to which he objected because it would be taking too much from the girls."   He says these conversations were before the codicil was made.    Whether, in the subsequent conversations with this witness and the others who testify on the subject, the testator intended to mislead them or not, it is not necessary to consider.    Those persons were his wife, who was the mother of Cornelia Elizabeth and of Mr. McKeon, and his wife's sister and her husband.   It is enough to say that the testimony is incompetent.

The complainants are not barred by laches.   The premises in question have been in dispute between the parties to this suit for very many years, and have been accordingly dealt with by all parties as property the title whereto was in litigation.   In 1857 the executors, on a representation that the personal estate of the testator was insufficient to pay his debts, obtained an order of the orphans' court of the county of Bergen to sell part of the real estate.   Under that order they sold part of the disputed premises.   A part of the proceeds of the sale has remained, after payment of the testator's debts, in the hands of the executors ever since that time awaiting a judicial determination of the dispute as to the title.   The rest of the property has, as before stated, been regarded by the parties as being in dispute, and no equity is set up against the complainants.   The latter are entitled to the relief they pray in their bill.

The executors will be decreed to sell the premises under the power given in the fourth section of the will, and dis-

tribute the proceeds, with the balance of the proceeds of the sale above mentioned, under the order of the orphans' court, to the persons entitled thereto under that section.